C.T., T.T., AND J.T., A MINOR REPRESENTED BY HIS NATURAL GUARDIANS,
C.T. AND T.T.,

Plaintiffs,

VERSUS

VALLEY STREAM UNION FREE SCHOOL DISTRICT AND THE BOARD OF EDUCATION OF
VALLEY STREAM UNION FREE SCHOOL DISTRICT,

Defendants.
_____

**MEMORANDUM AND ORDER**
August 16, 2016
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff, J.T., along with his parents, C.T. and T.T. (hereinafter, "plaintiffs"), bring this action against defendants, Valley Stream Union Free School District and the Board of Education of Valley Stream Union Free School District (hereinafter, "defendants").[1]

Plaintiffs allege that J.T. was bullied by students at his school and that, although they repeatedly complained about J.T.'s harassment, defendants failed to prevent the bullying. They further allege that defendants repeatedly suspended J.T in retaliation for making these complaints about J.T.'s treatment.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendants' motion is granted in part and denied in part. Specifically, the Court grants the summary judgment motion on all claims, with the exception of the First Amendment retaliation and negligent supervision claims.

I.   BACKGROUND

A.   Factual Background

The Court has taken the facts described below from the parties' affidavits, exhibits, and Local Rule 56.1 Statements of Facts. Unless otherwise noted, the facts are undisputed. Upon consideration of the

---

[1] Defendants contend that they should properly be referred to as "Valley Stream Central High School District."

motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2001).

Between 2011 and 2014, J.T. attended seventh, eighth, and ninth grades at South High School (hereinafter, "the school"). (*See* Defs.' Ex. W at 10-11.) Plaintiffs allege that J.T. was systematically bullied during this time.[2]

Plaintiffs claim that they first complained about J.T. being bullied in February 2012 to the school's principal, Maureen Henry (hereinafter, "Principal Henry"). (Defs.' Ex. V at 20-21.) T.T., J.T.'s mother, testified that Principal Henry told her that she would investigate the bullying allegations and report back; however, T.T. could not recall any follow-up from Principal Henry. (*Id.* at 23.)

T.T. also testified that she contacted the school again later that spring after J.T. was issued a suspension for fighting with student C.O. (*Id.* at 25.) She spoke with Assistant Principal, Cara Jacobson (hereinafter, "Assistant Principal Jacobson") and complained that the school was not doing anything to prevent run-ins between J.T. and C.O. (*Id.* at 25-26.) T.T. stated that Assistant Principal Jacobson said she was not aware of the bullying. (*Id.* at 26.)

J.T. received two suspensions in March, one in April, and one in May 2012. (*See* Defs.' Ex. H.)

The following academic year, in October 2012, plaintiffs testified that several students came to their house after school and called for J.T. to come out so that they could "kick his a**."[3] (*See* Pls.' Ex. 1 at 38, 75; Defs.' Ex. V at 23.) Plaintiffs assert that they called the school, which said it could not do anything because the students were not on school grounds. (Defs.' Ex. V at 24-25.) J.T. was suspended in October 2012 and in January 2013. (*See* Defs.' Ex. H.)

In February 2013, C.T., J.T.'s father, picked up J.T. from school. When he arrived, several students surrounded C.T.'s vehicle and told him that they were going to "kick J.[T.'s] f******a**" and one of the students said his father would come to "kick [C.T.'s] f****** a**." (Pls.' Ex. 2 at 29-30.) Principal Henry was advised of the run-in. (*Id.* at 35.)

Following this incident, plaintiffs met with Jill Vogel (hereinafter, "Vogel"), the school's Director of Guidance, and Principal Henry on February 13, 2013.[4] (Defs.' Ex. V at 37-38.) According to plaintiffs, during the meeting, Vogel denied being aware of any bullying and Principal Henry purportedly told plaintiffs that if J.T. were involved in any future incidents, regardless of whether he was the instigator, he would be suspended. (*See* Pls.' Ex. 3 at 28.)

---

[2] J.T. provided testimony concerning the different instances of harassment he experienced; however, in the interest of brevity, the Court has not delineated each incident of bullying behavior but has only provided the facts necessary for its analysis.

[3] In T.T.'s 50-H deposition, she seems to state that this event occurred in October 2012. (Pls.' Ex. 1 at 38.) However, in her deposition on March 11, 2015, she states that this incident occurred in the spring of 2012. (Defs.' Ex. V at 23.)

[4] During his 50-H hearing testimony, C.T. testified that this incident occurred in April 2013. However, when he later testified during his deposition, he was presented with a copy of the police report prepared regarding the incident, which established that the date of the incident was February 4, 2013. (*See* Pls.' Ex. 3 at 13.)

2

Following the meeting, Vogel sent plaintiffs an e-mail summarizing the steps she had taken to address J.T.'s conflict with other students, which included meeting with all of the students involved and advising J.T.'s teachers that he should be kept away from the students who were bullying him. (*See* Defs.' Exs. K, V at 41-42.)

T.T. testified that she called Vogel again in the spring of 2013, complaining that Principal Henry was not adequately addressing the bullying and reporting that J.T. had been issued a suspension for hitting another student with a ball during a gym dodgeball game. (Defs.' Ex. V at 44.) Vogel apparently told her to discuss the matter with Principal Henry. (*Id.* at 43.) T.T. proceeded to call Principal Henry, though it appears no resolution was reached. (*Id.* at 45.) J.T. served a suspension on March 6, 2013. (*See* Defs.' Ex. H.)

On March 7, 2013, plaintiffs met with the school superintendent, Dr. William Heidenerich (hereinafter, "Dr. Heidenerich"), to discuss the bullying, the school's alleged failure to prevent it, and J.T.'s frequent suspensions. (Defs.' Ex. V at 45-47.) According to plaintiffs, Dr. Heidenerich told them that the suspensions J.T. had received were unwarranted and that such a serious punishment was typically reserved for students who brought weapons to school or injured another student. (Pls.' Ex. 3 at 40.) T.T. testified that Dr. Heidenerich told them that, typically, in similar situations, he would convene a meeting with the parents and principal, but he would not do so here because he could tell that their relationship with Principal Henry was "bruised." (Defs.' Ex. V at 47-48.) At the close of the meeting, Dr. Heidenerich told plaintiffs that he would speak with Principal Henry and report back. (*Id.* at 48.)

J.T. received an in-school suspension the following day, March 8. (Defs.' Ex. H.) Upon learning that J.T. had been suspended, C.T. sent an e-mail to Dr. Heidenerich stating that J.T. had not been given any classwork or homework while serving his in-school suspension that day and complaining that the failure to give J.T. his work was keeping him from learning anything. (*See* Defs.' Ex. L.) The e-mail also advised Dr. Heidenerich that plaintiffs had delivered to the school a letter following up on their meeting from the day before. (*See id.*) In the letter, plaintiffs stated their position that J.T.'s frequent suspensions were interfering with his education, included a list of issues they asked Dr. Heidenerich to investigate or address, and requested certain records related to J.T.'s disciplinary and academic history. (*See* Defs.' Ex. M.) J.T. was subsequently suspended on March 12. (*See* Defs.' Ex. H.) On March 15, 2013, Dr. Heidenerich replied to plaintiffs' March 8 letter, answering their questions and providing the requested documents. (Defs.' Ex. N.) J.T. was suspended again on April 15 and May 28, 2013. (*See* Defs.' Ex. H.)

Around this time, T.T. also complained to either Vice-Principal Jacobson or to Principal Henry because J.T.'s locker was next to the locker of one of the students who bullied him, which was causing additional conflict between the two boys. (Defs.' Ex. V at 63.) T.T. testified that she was told that she should have raised the issue sooner but that the school agreed to move J.T.'s locker. (*Id.* at 65.)

According to plaintiffs, the bullying continued during J.T.'s ninth grade year. In October 2013, J.T. avers that another student slapped him in the face. (Defs.' Ex. W at 50.) J.T. was suspended after the incident, although he alleges that the attack was unprovoked. (*Id.* at 53; Defs.' Ex. V at 61.) J.T. admits that he had not complained to

3

anyone at the school about this student prior to the altercation. (Defs.' Ex. W at 53.)

Following the incident, plaintiffs' former attorney sent a letter to defendants requesting an investigation into the attack pursuant to New York's Dignity for All Students Act. (Defs.' Ex. O.) The letter closed by advising the school that, "[i]f I do not hear from you within seven days, I will assume that the District is not interested in pursuing an amicable resolution and will apprise my client (sic) of their legal rights and remedies under the applicable statutes." (*Id.*)

J.T. was suspended on November 7 and 12, 2013, and an additional thirteen times between January and May 2014. (*See* Defs.' Ex. H.)

T.T. testified that she again spoke with the school concerning J.T.'s bullying after she learned that another student had threatened that he was going to bring a gun to school and shoot J.T. (Defs.' Ex. V at 64-65), again after learning about an altercation between J.T. and another student in the lunchroom (*id.* at 69), and again in June 2014 after a student spit on J.T. (*id.* at 67).

### B. Procedural History

On August 18, 2015, this Court denied defendants' motion to dismiss. On December 11, 2015, defendants moved for summary judgment on all of plaintiffs' claims. On February 12, 2016, plaintiffs filed their opposition. Defendants replied on February 26, 2016. Oral argument was held on April 20, 2016. The matter is fully briefed, and the Court has considered all of the parties' submissions.

### II. STANDARD OF REVIEW

The standard for summary judgment is well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted).

4

Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### III. DISCUSSION

#### A. First Amendment Retaliation

To show retaliation in violation of the First Amendment, a "plaintiff must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). Chilled speech, however, is not necessary if the plaintiff can establish that he suffered some other "concrete harm." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Defendants argue that they are entitled to summary judgment on plaintiffs' First Amendment retaliation claim for two reasons. First, they allege that the speech was not protected because it did not relate to a matter of public concern. Second, they contend that there is no evidence that J.T.'s suspensions were imposed in retaliation for plaintiffs' speech. (Defs.' Mot. Summ. J. ("Mot.") at 5, ECF No. 54.)

1. Public Concern

Defendants claim that plaintiffs' speech is not subject to First Amendment protection unless it relates to a matter of public concern. (Mot. at 5-6.) The "public concern" requirement emerged from to First Amendment retaliation cases involving public employees. The Sixth Circuit described the genesis of the public concern requirement in *Jenkins v. Rock Hill Local School District*:

> The public concern test originated in *Pickering v. Board of Education*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983), in which the Supreme Court held the First Amendment protects from retaliation government employees who speak on matters of public concern. Following its rationale in *Pickering*, the Court in *Connick* sought to balance the interests of government employees, as citizens, "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." To achieve this balance, the Court held the speech of government employees is constitutionally protected if it touches upon a matter of public concern. *Connick* was expressly limited to government employees and based solely on the need to balance the free speech rights of government employees with the government's needs as an employer.

513 F.3d 580, 586 (6th Cir. 2008) (select internal citations omitted).

5

Although the public concern requirement originated in the public employment sphere, defendants note that some courts, including, most notably, the Seventh Circuit in *Landstrom v. Illinois Department of Children & Family Services*, 892 F.2d 670, 679 (7th Cir. 1990), have extended the public concern requirement to First Amendment claims outside this context. In *Landstrom*, the court dismissed the parents' First Amendment retaliation claim against their daughter's school because it determined that the parents' speech concerned only personal complaints, not matters of public concern. *Id.* Defendants rely on this case to similarly argue that T.T. and C.T.'s speech should not be protected because it related only to their concerns regarding J.T. and did not address matters of public concern. (Pls.' Opp'n to Defs.' Mot. Summ. J. ("Opp'n") at 5-6, ECF No. 61.)

However, courts outside the Seventh Circuit[5] have declined to impose the public concern requirement beyond the public employment context. *See, e.g.*, *Jenkins*, 513 F.3d at 586-89 (rejecting *Landstrom* and holding that parents' complaints to the school were protected by the First Amendment regardless of whether they touched on matters of public concern); *see also Van Deelen v. Johnson*, 497 F.3d 1151, 1156-57 (10th Cir. 2007) ("The public concern test, then, was meant to form a sphere of protected activity for public employees, not a constraining noose around the speech of private citizens. To apply the public concern test outside the public employment setting would require us to rend it from its animating rationale and original context."); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 765-67 (9th Cir. 2006) ("[W]e do not read *Tinker*, its progeny or our own cases applying its standard as importing [the] public concern test into the public education context."); *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 284 (3d Cir. 2004) ("[O]utside the employment context[,] the First Amendment forbids retaliation for speech even about private matters."); *Campagna v. Mass. Dep't of Enviro. Protection*, 334 F.3d 150, 155 (1st Cir. 2003) ("Since the reason for the test is missing in the present case—maintaining order in the governmental workplace—the [public concern doctrine] should not be applied here." (citation omitted)). Most relevant here, in *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000), the Second Circuit held that the public concern requirement, having been developed in the context of public employee speech, had "no place" in the context of prisoner petitions for redress of grievances, which typically relate only to matters of personal concern. In doing so, the Second Circuit expressly rejected the defendant's argument "that where the plaintiff alleges retaliation for protected speech in the form of a petition to the government, he must establish that the speech contained in his petition to the government was a matter of public concern." *Id.*

Nevertheless, defendants point out that the Second Circuit has yet to rule on the issue of whether a parental complaint to a school official must touch on a matter of public concern to receive First Amendment protection and argue that this Court should follow *Landstrom* and apply the public concern requirement to plaintiffs' First

---

[5] Some courts within the Seventh Circuit have refused to apply the public concern requirement to non-governmental employees. *See, e.g.*, *Van Dyke v. Barnes*, No. 13-CV-5971, 2015 WL 148977, at *6 (N.D. Ill. Jan. 12, 2015) (declining to apply public concern requirement to speech by a non-public employee and noting that "subsequent to *Landstrom*, the Seventh Circuit abrogated its own precedent that applied the 'public concern' test to non-public employees, holding that a prisoner's speech can be protected under the First Amendment even where it does not involve a matter of public concern"); *Nolan v. Village of Dolton*, No. 10-CV-7357, 2011 WL 1548343, at *1-2 (N.D. Ill. April 21, 2011).

Amendment claim. This Court will not do so. Although the Second Circuit has not weighed in on the precise question to be decided here, the Second Circuit's refusal in *Friedl* to apply the public concern requirement outside the public employment context to prisoner petitions is consistent with the above-cited Circuit decisions that have protected speech pertaining to private concerns in the school setting, *see Jenkins*, 513 F.3d at 586-89; *Pinard*, 467 F.3d at 765-67, and leads this Court to conclude that a similar outcome is warranted here. As these cases recognize, the need to balance between the government employee's right to speak and his employer's need to efficiently deliver services, which drove the development of the public concern requirement, *see, e.g.*, *Bridges v. Gilbert*, 557 F.3d 541, 550 (7th Cir. 2009), simply does not exist in these circumstances. *See Eichenlaub*, 385 F.3d at 284 ("The rationale for a public/private concern distinction that applies to public employees simply does not apply to citizens outside the employment context."). Thus, this Court concludes that plaintiffs' speech need not relate to a matter of public concern in order to receive First Amendment protection in this case and, therefore, declines to grant defendants' motion for summary judgment on this ground.

2. Retaliatory Intent

Defendants also contend that plaintiffs' First Amendment retaliation claim fails for the separate reason that plaintiffs cannot show that the retaliatory suspensions were motivated by their speech. (Mot. at 7.) Plaintiffs, however, argue that defendants' retaliatory intent is evidenced by the close temporal proximity between their complaints to the school and the school's subsequent suspensions of J.T. (Opp'n at 7-8.) In fact, the record reflects that J.T. was repeatedly suspended within weeks or days following plaintiffs' complaints. For instance, plaintiffs met with Dr. Heidenerich on March 7, 2013 and criticized the school's failure to respond to the alleged bullying and, the following day, J.T. was suspended. (*See* Defs.' Exs. H, V at 46-47.) Similarly, after plaintiffs' attorney sent a letter to the school regarding their concerns about the school and implied that they might initiate legal action if the school failed to comply with their requests, just over a week later, on November 7, J.T. was issued a suspension. (*See id.* at Exs. H, O.) J.T. received another suspension on November 12, and then was suspended an additional thirteen times during the remainder of the academic year for a total of twenty-one days of suspension. The volume of the suspensions and the fact that they followed so closely after plaintiffs' complaints supports an inference that the suspensions were retaliatory. *See, e.g.*, *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 511-12 (E.D.N.Y. 2011) ("It is well settled that proof of causation may be shown indirectly by, *inter alia*, demonstrating that the protected activity was followed closely by a retaliatory action." (citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001))).

However, defendants argue that there is no causal connection between plaintiffs' speech and the suspensions, pointing out that the teachers who reported the misconduct for which J.T. was suspended were not aware of his parents' speech and, further, that J.T.'s discipline was warranted based on his misconduct. (Mot. at 8.) However, even if the teachers who referred the infractions were unaware of his parents' complaints, the individual actually imposing the punishment, Principal Henry, was aware and, further, she was the subject of a number of their complaints. (*See* Pls.' 56.1 ¶ 110; *see also* Defs.' Ex. I (Principal Henry signed each letter informing plaintiffs that J.T. had

7

received an out-of-school suspension).) Additionally, and significantly, Dr. Heidenerich purportedly told plaintiffs that the suspensions issued to J.T. were unwarranted, explaining that such serious penalties were usually reserved for cases in which a student brought a weapon to school or injured another student. (Pls.' 56.1 ¶ 105.) From this evidence, a reasonable jury could conclude that Principal Henry was imposing harsher punishments on J.T. in retaliation for plaintiffs' complaints to the school.

That defendants disciplined J.T. in retaliation for his parents' speech is further reinforced by plaintiffs' allegation that Principal Henry told them in the spring of 2013 that, regardless of the circumstances, if J.T. were involved at all in any future disciplinary incident, he would be suspended. (*Id.* ¶ 104.) Finally, there is evidence in the record of hostility and antagonism between Principal Henry and plaintiffs that could allow a jury to conclude that Principal Henry would have reason to retaliate against plaintiffs. For instance, plaintiffs specifically criticized Principal Henry several times for failing to prevent J.T.'s bullying. For her part, Principal Henry testified during her deposition that plaintiffs were "always complaining." (*Id.* ¶ 113.) Additionally, Dr. Heidenerich described the relationship between plaintiffs and Principal Henry as "bruised." (Defs.' Ex. V at 47-48.) The forgoing evidence, construed most favorably to plaintiffs, certainly raises an issue of material fact as to whether defendants acted with retaliatory intent in suspending J.T.[6]

Accordingly, because the Court finds defendants' bases for dismissing the First Amendment retaliation argument to be unpersuasive, defendants' motion for summary judgment on this claim is denied.

B. Due Process Claims

1. Procedural Due Process

In order to assert a claim for violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL–CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted) (emphasis omitted). New York's Constitution and education laws provide a right to elementary and secondary education for children up to the age of eighteen. N.Y. Const. Art. XI § 1; N.Y. Educ. L. § 3202(1). J.T.'s suspensions constitute a deprivation of

---

[6] The Court notes that this First Amendment claim is somewhat unusual in that it was C.T. and T.T. who were responsible for the speech at issue, but the retaliatory conduct was directed at J.T. Defendants do not challenge this claim on that ground, and the Court does not believe that this factual distinction requires dismissal of the claim. As one court observed, when the defendant contended that the plaintiffs/parents could not maintain their First Amendment retaliation claim because all of the retaliatory conduct was directed at their son, "a parent's constitutional right to criticize school officials would collapse if such an argument were taken to its logical end point. School officials could immunize themselves from any criticism by swiftly punishing any student who is the child of a critical parent." *Cain v. Tigard-Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120, 1128-29 (D. Or. 2003); *see also Jones v. Bay Shore Union Free Sch. Dist.*, 947 F. Supp. 2d 270, 276 (E.D.N.Y. 2013) (father could maintain First Amendment retaliation claim where his daughter was suspended allegedly in retaliation for his speech). The court in *Cain v. Tigard-Tualatin School District 23J* also concluded that the son could make a First Amendment retaliation argument based on his parents' speech, noting that, if the defendants retaliated against him because his parents complained, it would interfere with his First Amendment right of association. 262 F. Supp. 2d at 1127; *see also Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999) (husband could sue when he was discharged in retaliation for his wife's speech).

this right. *See Goss v. Lopez*, 419 U.S. 565, 576 (1975). Therefore, the question is whether J.T. was deprived of an education without due process.

In *Goss v. Lopez*, the Supreme Court set forth minimal due process requirements attendant to the imposition of suspensions of ten days or fewer. Specifically, the Court held that:

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

419 U.S. at 581. However, "[a] formal hearing is unnecessary" for suspensions of ten days or fewer. *Rosenfeld v. Ketter*, 820 F.2d 38, 40 (2d Cir. 1987).

Here, each time J.T. was issued an out-of-school suspension, Principal Henry notified his parents by letter. (*See* Defs.' Ex. I.) The letters detailed the offending conduct and informed J.T. and his family of their right to a hearing at which J.T. could present his side of the story. (*See id.*) This process is all that is required under *Goss*, given that each of his suspensions was for fewer than ten days (*see* Defs.' Ex. H). *See Goss*, 419 U.S. at 581; *see also, e.g.*, *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 489-90 (E.D.N.Y. 2009) (plaintiff who was informed of his right to an informal hearing and received written notice of the charges against him was afforded all requisite process for five-day suspension), *aff'd*, 623 F.3d 71 (2d Cir. 2010); *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 419 (E.D.N.Y. 2009) ("[S]tudents facing a suspension of ten days or less are entitled only to an informal 'give and take' with the administrator imposing the penalty, at which the student is permitted to give her side of the story.").

In fact, plaintiffs do not contest that J.T. was afforded these protections, but rather contend that additional process was required because he was suspended for more than ten days *in aggregate*. Plaintiffs have not provided any support for this aggregation argument, nor has the Court found any support in this Circuit. In any event, this Court holds that the *Goss* rule applies to each individual suspension, rather than to the suspensions in aggregate. Thus, because no suspension was longer than ten days, and because the undisputed facts demonstrate that J.T. was afforded adequate process under *Goss* for these suspensions, plaintiffs have failed to show any denial of procedural due process. Accordingly, defendants' motion for summary judgment on the procedural due process claim is granted.

2. Substantive Due Process

Substantive due process is a means of "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005)

(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).[7]

Plaintiffs argue that their substantive due process rights were violated because, despite their many complaints about J.T.'s treatment, defendants did not prevent the ongoing bullying. (Opp'n at 10-11.) However, uncontroverted evidence in the record demonstrates that defendants did take measures to address the harassment. For instance, after C.T. reported an incident during which several students surrounded his car and threatened to "do bodily harm" to J.T. (*see* Pls.' Ex. 2 at 28, 40), the school met with the alleged bullies and admonished them to stop, warned them to avoid J.T., instructed teachers that the alleged bullies should not be seated next to J.T., and requested that the school social worker hold a mediation between J.T. and the alleged bullies (*see* Defs.' Ex. K). Similarly, after plaintiffs raised their concerns with Dr. Heidenerich, he promptly responded and provided the requested answers and information concerning J.T.'s academic and disciplinary history. (*See* Defs.' Ex. N.) On another occasion, after T.T. called the school complaining that J.T. had been assigned a locker next to one of the students that bullied him, the school moved J.T.'s locker. (Defs.' Ex. V at 63-65.) Even if defendants were unable to end the bullying or plaintiffs considered defendants' response to their grievances to be inadequate, no reasonable jury could conclude that defendants' actions were sufficiently egregious or outrageous to support a substantive due process violation. *See Smith v. Guilford Bd. of Educ.*, 226 F. App'x 58, 62 (2d Cir. 2007) (summary order) ("Defendants' failure to respond to the harassing and bullying . . . while highly unfortunate, does not rise to the level of 'egregious conduct . . . so brutal and offensive to human dignity as to shock the conscience.'" (quoting *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (alteration in original))); *P.W. v. Fairport Cent. Sch. Dist.*, 927 F. Supp. 2d 76, 84 (W.D.N.Y. 2013) (concluding that the conduct of school district that took "some steps" to respond to bullying could not be considered "conscience shocking" or "offensive to human dignity" even if it was allegedly inadequate and failed to prevent bullying); *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 CS, 2012 WL 4477552, at *12-13 (S.D.N.Y. Sept. 27, 2012) (noting that even if defendants did *nothing* to respond to complaints of verbal harassment and limited physical abuse their conduct would not be conscience-shocking); *S.C. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-1672 CS, 2012 WL 2940020, at *8 (S.D.N.Y. July 18, 2012) (holding that school district's actions did not shock the conscience where it took "some steps" to address the harassment); *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 770-71 (S.D.N.Y. 2011) (defendants' behavior was not conscience-shocking despite the fact that they allegedly failed to adequately punish verbal threats made by students who later physically assaulted plaintiff); *Scruggs v. Meriden Bd. of Educ.*, No. 3:03-CV-2224(PCD), 2007 WL

---

[7] "As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). However, "in exceptional circumstances a governmental entity may have a constitutional obligation to provide such protection, either because of a special relationship with an individual, or because the governmental entity itself has created or increased the danger to the individual." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (internal citations omitted). As the Court concludes that plaintiffs' substantive due process claim fails for the separate reason that defendants' conduct was not egregious or outrageous, it need not decide whether the State was even required to protect J.T. from private harm.

2318851, at *13 (D. Conn. Aug. 10, 2007) ("Defendants' failure to fully remedy the bullying situation does not amount to 'brutal' or 'oppressive' treatment of [the plaintiff] at school."). Therefore, plaintiffs are entitled to summary judgment on the substantive due process claim.

Separately, plaintiffs argue that their substantive due process rights were violated because defendants "actively took steps to punish [them] for reporting" the bullying. (Opp'n at 9.) This argument is legally untenable. The "arbitrary, conscience shocking, or oppressive" behavior about which plaintiffs complain is defendants' alleged retaliation against plaintiffs for their exercise of their First Amendment rights. In other words, they are effectively claiming that they were denied substantive due process because their First Amendment rights were violated. However, "where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." *Kia P. v. McIntyre*, 235 F.3d 749, 757-58 (2d Cir. 2000) (quoting *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (internal quotation marks omitted)). Thus, this generalized substantive due process claim must be subsumed into the First Amendment claim. *See, e.g., Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013) (dismissing substantive due process claim because there was substantial overlap with the First Amendment claim in the "harm and conduct challenged"); *Kasprzycki v. DiCarlo*, 584 F. Supp. 2d 470, 478 (D. Conn. 2008) (substantive due process claim would not lie where it was duplicative of First Amendment retaliation claim).

### C. Title VI Claim

To establish a Title VI claim, a plaintiff must show: (1) that the defendant discriminated against him on the basis of race, (2) that the discrimination was intentional, and (3) that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001). In support of this argument, plaintiffs merely claim that "the harassment incurred by J.T. would have been addressed differently had J.T. been Caucasian." (Opp'n at 12.) However, they provide no factual support to substantiate this claim. In fact, during her deposition, T.T. admitted that the only basis for her belief that J.T.'s bullying was not addressed on account of his race was the fact that her family is African-American and Principal Henry is Caucasian.[8] (Defs.' Ex. V at 83.)

---

[8] The following exchange occurred during T.T.'s deposition:

> Q: Why do you believe that Miss Henry didn't [address the incidents of bullying]?
> A: I don't have a reason.
> Q: You think just because Miss Henry is Caucasian and you and your family are African American, that it why Miss Henry didn't take care of the situations?
> A: Yes.

(Defs.' Ex. V at 83.) T.T. was similarly unable to articulate any basis for his belief that his son's treatment was based on his race:

> Q: So, if I am understanding you correctly, what you are saying [is] because the district didn't handle things properly, you believe

Thus, there is no factual basis from which a rational jury could conclude that defendants intentionally discriminated against J.T. on the basis of his race. *See, e.g.*, *Saggio v. Sprady*, 475 F. Supp. 2d 203, 209 & n.6 (E.D.N.Y. 2007) (holding that plaintiff failed to show that school administration's response to plaintiff's bullying was driven by racial animus where there was "no showing that the steps taken by the District to deal with [the bullying] were in any way racially motivated or limited as a result of racial considerations"); *see also Kajoshaj v. New York City Dep't of Educ.*, 543 F. App'x 11, 14 (2d Cir. 2013) (summary order) ("[The] 'naked allegation' that [the plaintiffs] were treated differently from non-Muslim, non-Albanians cannot demonstrate a plausible entitlement to Title VI relief."); *Gear v. Dep't of Educ.*, No. 07 CIV 11102 NRB, 2010 WL 5297850, at *5 (S.D.N.Y. Dec. 21, 2010) (holding that plaintiff's "single, conclusory allegation that [the defendant] would have acted differently if she were white" was insufficient to state a plausible claim for relief where the "allegation [was] unaccompanied by any facts regarding [the defendant's] statements, actions, or policies that would support a plausible inference of discriminatory animus or disparate impact"), *aff'd*, 472 F. App'x 67 (2d Cir. 2012).[9] Accordingly, summary judgment on the Title VI claim is granted in favor of defendants.

D. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Here, plaintiffs argue that defendants contravened the Equal Protection Clause by disproportionately disciplining African-American students relative to their Caucasian peers. (Opp'n at 13-14.) In order to successfully demonstrate this type of "selective enforcement" theory under the Fourteenth Amendment, plaintiffs must prove that "(1) [J.T.], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Brown v. City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012) (internal quotation marks and citations omitted). In particular, at the summary judgment stage, a "plaintiff must present evidence comparing [himself] to individuals that are 'similarly situated in all material respects,'" *Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 283 (E.D.N.Y. 2014), and must show how this "similarly situated" individual of a different race was not subject to the same offensive conduct, *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).

Plaintiffs attempt to substantiate their argument by relying on statistics that compare the percentage of the student body made up of Caucasian and African-American students, respectively, with the percentage that each race constituted of the students disciplined. (Opp'n at 14.) They argue that this data reflects that "the proportion of

---

      therefore it must be because of race.
      A: Possibly, yes.

(Pls. Ex. 2 at 77-78.)

[9] Plaintiffs also attempt to establish intentional discrimination by asserting that when a student, N.I., told a third classmate that he would stab J.T., defendants took no action against N.I. because N.I. is Caucasian. (Opp'n at 12.) However, the school did not discipline N.I. because an investigation into the incident revealed that no threat was made (Defs.' Ex. Z at 28), and thus, the school had no grounds to punish N.I. Therefore, this argument does not support plaintiffs' Title VI claim.

African-American students disciplined is substantially higher than the overall proportion of students in the district." (*Id.*) This assertion may be mathematically accurate, but the data also reveal that the same is true for Caucasian students, and, in fact, in two out of the three years for which the statistics are provided, the rate at which Caucasian students were disciplined exceeded that of African-American students.[10] Thus, this data does not validate the argument that the rules were selectively enforced against African-American students, and it cannot substantiate plaintiffs' Equal Protection claim. *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 563 (S.D.N.Y. 2010) (parents failed to establish a disputed issue of fact regarding their equal protection claim where they offered only "bare statistics" that "fail[ed] to present the required 'stark pattern' of discrimination necessary for statistics to be acceptable as the sole proof of discriminatory intent under the Constitution" (quoting *Chesna v. U.S. Dep't of Def.*, 850 F. Supp. 110, 117-18 (D. Conn. 1994))). In short, plaintiffs have failed to submit any evidence from which a jury could rationally find selective enforcement of discipline against African-American students relative to their Caucasian peers. Accordingly, the Equal Protection claim based on race cannot survive summary judgment.

Plaintiffs also make a rather perfunctory selective enforcement argument based on J.T.'s alleged disability. However, plaintiffs provide only the conclusory assertion that J.T. was treated differently than his nondisabled peers, but fail to identify any similarly situated comparator. Therefore, there is no basis from which a rational jury could conclude that J.T. was treated differently because of his disability, and plaintiffs' Equal Protection claim based on disability fails. *Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07CV8828(KMK), 2009 WL 3151200, at *7 (S.D.N.Y. Sept. 29, 2009) (dismissing Equal Protection claim because plaintiffs failed to identify any similarly situated person was treated differently from the plaintiffs); *Bikur Cholim, Inc. v. Vill. of Suffern*, 664 F. Supp. 2d 267, 278 (S.D.N.Y. 2009) ("Without any comparators pleaded in the amended complaint for the Court to examine, . . . plaintiffs' claim under the Equal Protection Clause cannot stand. Therefore, it will be dismissed."). Accordingly, summary judgment is also warranted for the Equal Protection claim based on disability.

E.   State Law Claims

1.   Negligent Hiring and Training Claim

Defendants argue that the Court lacks subject matter jurisdiction over certain of plaintiffs' negligence claims because plaintiffs failed to include them in their notice of claim. "Under New York law, a notice of claim is a condition precedent to bringing certain tort actions against a municipality such as the City for damages sustained by reason of the negligence or wrongful act of the municipality or its officers, agents or employees." *Hargroves v. City of New York*, No. 03-CV-1668 RRM VMS, 2014 WL 1271024, at *5 (E.D.N.Y. Mar. 26, 2014). Pursuant to General Municipal Law § 50-e, the notice must contain "the time when, the place where and the manner in which the

---

[10] The data presented by plaintiffs reveals that in 2011-12, African-American students comprised 22% of the student body, but were 32% of the students disciplined; however, Caucasian students made up 33% of the student body, and were 60% of the students disciplined. (*See* Opp'n at 14.) During the 2012-13 school year, African-American students comprised 24% of the student body, but were 37% of those disciplined; however, Caucasian students made up 29% of the student body, and were 50% of the students disciplined. (*Id.*)

13

claim arose." N.Y. Gen. Mun. Law § 50-e (McKinney). "The Notice need not provide that information with 'literal nicety or exactness'; rather, the test is whether the Notice provides facts sufficient to enable the County to investigate." *Fisher v. Cty. of Nassau*, No. 10-CV-0677 JS ETB, 2011 WL 4899920, at *3 (E.D.N.Y. Oct. 13, 2011) (quoting *Phillipps v. N.Y. City Transit Auth.*, 890 N.Y.S.2d 510, 512 (App. Div. 2009)). Notice of claim requirements are strictly construed. *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).

It is undisputed that plaintiffs' notice of claim does not assert claims for negligent hiring and training. Nevertheless, plaintiffs assert that they alleged facts in their notice of claim that gave defendants sufficient notice of these claims, though they fail to identify which facts supposedly provided this notice. (*See* Opp'n at 15-16.) Based on its review of the notice, the Court does not agree with plaintiffs. The notice of claim contains only facts pertaining to the treatment of J.T.; it does not include facts that would alert defendants to claims regarding the hiring and training of its employees. Therefore, these claims must be dismissed. *See, e.g.*, *Hargroves*, 2014 WL 1271024, at *6 (first plaintiff's notice of claim that alleged only facts relating to false arrest did not put defendants on notice of negligent hiring, training and supervision claim, whereas second plaintiff's notice of claim that contained allegations concerning the defendant's unfitness as a police officer did provide notice); *Fisher v. Cty. of Nassau*, No. 10-CV-0677 JS ETB, 2011 WL 4899920, at *3 (E.D.N.Y. Oct. 13, 2011) ("Nowhere in his Notice of Claim narrative does Plaintiff suggest that he planned to pursue negligent hiring and negligent supervision. This oversight is fatal to these causes of action."); *Ferlito v. Cty. of Suffolk*, No. CIVA065708(DRH)(AKT), 2007 WL 4180670, at *4 (E.D.N.Y. Nov. 19, 2007) (dismissing negligent hiring, training and retention claims because "the facts alleged in the notice of claim are limited to the occurrences of July 24, 2005 and the facts with respect to negligent hiring, training and retention would, of necessity, have occurred prior to that date"); *Jewell v. City of New York*, No. 94 CIV. 5454 (DLC), 1995 WL 86432, at *1 (S.D.N.Y. Mar. 1, 1995) (notice of claim was inadequate where it alleged only "negligence," but did not contain "facts suggesting that this referred to the City's hiring practices rather than to the tortious acts of the traffic agent and police officer").

However, even if these claims were not barred by the notice of claim requirements, they would separately fail as plaintiffs have not provided any facts or legal argument to support these claims.

2. Negligent Care, Supervision, and Administration of Discipline Claim

"A school district has the duty to exercise the same degree of care over the pupils under its control as a reasonably prudent parent would exercise under the same circumstances, and a breach of this duty may form the basis for a claim for negligent failure to supervise."[11] *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 402 (E.D.N.Y. 2005). "Defendants may only be liable for injuries which are reasonably foreseeable and proximately related to the school's failure to provide adequate supervision." *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 605 (S.D.N.Y. 2011)

---

[11] Plaintiffs assert claims for "negligent care" and negligent "administration of discipline." These claims appear to merely relate to aspects of the negligent supervision claim and will be evaluated in the analysis of that claim.

(internal citation omitted), *on reconsideration sub nom. DC v. Valley Cent. Sch. Dist.*, No. 7:09-CV-9036 WWE, 2011 WL 3480389 (S.D.N.Y. June 29, 2011). "To determine 'whether the duty to provide adequate supervision has been breached in the context of injuries caused by the acts of fellow students, it must be established that school authorities had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated.'" *Emmanuel B. v. City of New York*, 15 N.Y.S.3d 790, 793 (App. Div. 2015) (quoting *Mirand v. City of New York*, 637 N.E.2d 263 (N.Y. 1994)). On the question of notice, the New York Court of Appeals has explained that:

> [a]ctual or constructive notice to the school of prior similar conduct is generally required because, obviously, school personnel cannot reasonably be expected to guard against all of the sudden, spontaneous acts that take place among students daily; an injury caused by the impulsive, unanticipated act of a fellow student ordinarily will not give rise to a finding of negligence absent proof of prior conduct that would have put a reasonable person on notice to protect against the injury-causing act.

*Mirand*, 637 N.E.2d at 266. A school may make a prima facie showing of lack of notice "where the prior conduct was unrelated to or of a different nature than the conduct at issue." *Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 647 (E.D.N.Y. 2013) (and collecting cases).

Some of the offensive behavior about which J.T. complains clearly could not support a negligent supervision claim, as it is clear that defendants would have had no way of anticipating it. For instance, J.T. alleges that bully C.O. slapped him in the face in October 2013. (Defs.' Ex. W at 51.) However, J.T. admits that he had never made any complaints to defendants concerning this student prior to this incident. (*Id.* at 53.) Thus, there was plainly no way that defendants could have been aware of this risk and prevented the strike. Furthermore, this attack is the kind of "impulsive" and "unanticipated" act by a student against which defendants could not be expected to defend.

However, in other instances, the question of whether defendants were on notice regarding the potential for bullying, but failed to respond to the threat as a prudent parent would, is close enough to preclude summary judgment. For instance, student C.S. allegedly came to J.T.'s home in October 2012[12] with a group of students who threatened to "kick J.T.'s a**." (*See* Pls.' Ex. 1 at 38, 74-76.) Plaintiffs informed the school about this conduct. (*Id.* at 77.) In November 2012, C.S. allegedly began a campaign to recruit other students to "do bodily harm" to J.T. (Defs.' Ex. W at 56.) J.T. testified that he reported this behavior to a teacher shortly after it happened and then raised it again to the teacher four additional times. (*Id.* at 57-59.) However, J.T. contends that the teacher did nothing and that C.S.'s bullying persisted from November 2012

---

[12] As noted, there is some inconsistency in the record regarding whether this incident occurred in the spring of 2012 or in October 2012. (*Compare* Pls.' Ex. 1 at 38, *with* Defs.' Ex. V at 23.) Although the date this event transpired does not materially alter the Court's analysis, interpreting all facts in the light most favorable to plaintiffs, the Court will assume that it occurred in October, closer to the other relevant activity.

through the remainder of the academic year. (*Id.* at 59.) In fact, in April 2013, C.S. and other students allegedly surrounded C.T.'s car when he came to pick up J.T. and told C.T. that they planned to "kick J.[T.'s] f****** a**."[13] (Pls.' Ex. 2 at 28; *see also* Ex. 1 at 79-80.) C.T. reported this incident to school authorities as well. (*See* Pls.' Ex. 2 at 35.)

Thus, there is evidence in the record that the school was on notice that this student was threating J.T. with physical violence. Construing the facts most favorably to plaintiff, a rational jury could find that, after being made aware of these verbal threats, a reasonably prudent school administrator would have intervened or done more to address this harassment. *See, e.g.*, *Wilson ex rel. Wilson v. Vestal Cent. Sch. Dist.*, 825 N.Y.S.2d 159, 160-61 (App. Div. 2006) (denying summary judgment on negligent supervision claim arising out of injuries the plaintiff sustained when her classmate pulled her chair out from under her while seated because there were issues of material fact concerning whether defendants had sufficient notice based on history of conflict between the plaintiff and her classmate, which was reported to defendants and included destruction of the plaintiff's test papers, stealing the plaintiff's personal effects, screaming at the plaintiff, making prank calls to the plaintiff, and threatening to fight the plaintiff); *see also Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, No. 715CV0484GTSATB, 2016 WL 945350, at *13 (N.D.N.Y. Mar. 14, 2016) (denying motion to dismiss negligent supervision claim where the plaintiff put forth evidence that defendants knew of the ongoing bullying and failed to remedy that bullying).

In reaching this conclusion, the Court notes that a number of cases in this Circuit and State have granted summary judgment to schools on negligent supervision claims, finding that they were not on notice that a perpetrator might commit an injurious act. However, the Court finds distinctions in the instant facts that make this case distinguishable from those decisions. For example, here, the prior threats were targeted directly at J.T., in contrast to those cases in which the perpetrator, though perhaps possessing a disciplinary record, had never specifically targeted the plaintiff in the past. *Compare, e.g.*, *Carabello*, 928 F. Supp. 2d at 647 (school was not on notice that student would attack plaintiff, as his prior disciplinary incidents involved altercations with teachers, not the plaintiff), *with Amandola v. Roman Catholic Diocese of Rockville Ctr.*, 13 N.Y.S.3d 556, 557 (N.Y. App. Div. 2015) (denying school's motion for summary judgment because it failed to establish that it did not have notice of attacker's prior altercations with plaintiff).

Additionally, many of the decisions granting summary judgment to the defendant school do so on the basis that the injurious conduct could not have been predicted because it was dissimilar from any of the offender's prior misconduct. *See, e.g.*, *Carabello*, 928 F. Supp. 2d at 647 (prior incident, during which offender tried to touch a female student's neck and hair then blew kisses at her, did not put school on actual or constructive notice that offender would sexually assault plaintiff); *Barmore v. Aidala*, No. 04-CV-0445, 2006 WL 1978449, at *13 (N.D.N.Y. July 12, 2006) (plaintiffs could not maintain negligent lack of supervision claim where school had only been notified

---

[13] It appears that J.T. did not witness these threats being made, but presumably learned about them when he subsequently joined his father. (Pls.' Ex. 2 at 36.)

that assailant had uttered racial epithets to plaintiff and therefore lacked any actual or constructive notice that he would physically attack plaintiff); *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 349 F. Supp. 2d 521, 525 (E.D.N.Y. 2004) ("[P]rior, unrelated incidents resulting in discipline are insufficient to put a school on notice of a specific threat of danger requiring supervision."); *Emmanuel B. v. City of New York*, 15 N.Y.S.3d 790, 792 (App. Div. 2015) (school could not have anticipated physical attack where assailant had only previously made verbal threats). Here, in contrast, C.S. allegedly threatened that he would "kick J.T.'s a** in October, recruited students to "do bodily harm" to J.T. in November, and threatened to attack J.T. again in February. Construing the evidence most favorably to plaintiffs, a rational jury could reasonably find that the verbal threats in October were sufficiently similar to C.S.'s subsequent conduct that they could have put the school on notice that C.S. might persist in threatening J.T.

Further, plaintiffs testified that they complained several times to defendants about the conduct at issue. *Compare MacCormack v. Hudson City Sch. Dist. Bd. of Educ.*, 856 N.Y.S.2d 721, 723 (App. Div. 2008) (holding that school was not on notice that student would strike plaintiff where plaintiff never reported student's threats to school); *LaPage v. Evans*, 830 N.Y.S.2d 818, 820 (App. Div. 2007) (school could not have reasonably anticipated altercation where it had not been made aware of any conflict between the victim and perpetrator); *Danna v. Sewanhaka Cent. High Sch. Dist.*, 662 N.Y.S.2d 71, 73 (App. Div. 1997) (school could not have reasonably anticipated altercation between two students where plaintiff failed to inform school about her prior skirmish with her assailant). In fact, J.T. allegedly complained five times to his teacher about C.S.'s bullying, and C.T. and T.T. complained as well; thus, if such evidence is credited, it would support the conclusion that the school was aware of the issue.

Finally, this case is also unlike those in which the injury "occurs in so short a span of time that even the most intense supervision could not have prevented it," and therefore, "any lack of supervision is not the proximate cause of the injury." *Convey v. City of Rye Sch. Dist.*, 710 N.Y.S.2d 641, 646 (App. Div. 2000). Instead, here, J.T. testified that C.S. continued to bully him and recruit students to do bodily harm to him from November through the end of the school year. *Compare Kamara ex rel. Kamara v. City of New York*, 940 N.Y.S.2d 53, 54 (App. Div. 2012) (plaintiff could not show that negligent supervision proximately caused his injuries sustained when another student pushed him on the basketball court, despite the plaintiff's previous reports that the other student had bullied him, because the push "occurred in such a short span of time that it could not have been prevented by the most intense supervision").

Thus, in contrast to these other cases where the offender's conduct would have been difficult to prevent because it was anomalous or impulsive, here, plaintiffs have submitted evidence that they repeatedly reported that J.T. was being bullied, but the school allowed the same kind of harassment to persist. Construing the evidence most favorably to plaintiffs, a rational jury could find that the school's failure to respond to these threats amounts to a breach of their duty to supervise under New York law. Accordingly, the disputed issues of fact preclude summary judgment on this claim.

### 3. DASA Violation Claim

Plaintiffs' fifth cause of action alleges negligence per se arising from defendants' purported violation of New York's Dignity for All Students Act ("DASA"). Defendants oppose this argument, maintaining that there is no private right of action under DASA, though they acknowledge that the matter had not been addressed by a court in this District. (Mot. at 31-35.) However, subsequent to the completion of the briefing on this motion, two courts, one from the Northern District of New York and one from the New York Appellate Division, First Department, considered whether DASA encompasses an implied private right of action and concluded that it does not. *See Terrill v. Windham-Ashland-Jewett Central School District*, No. 115CV0615GTSDJS, 2016 WL 1275048, at *7 (N.D.N.Y. Mar. 31, 2016) and *Motta ex rel. Motta v. Eldred Cent. Sch. Dist.*, No. 522416, 2016 WL 3619331, at *1 (N.Y. App. Div. July 7, 2016). Although these opinions are not binding, this Court agrees with their well-reasoned conclusions and similarly determines that there is no private right of action under DASA. As the Appellate Division in *Motta ex rel. Motta v. Eldred Central School District* recognized, "[t]here is no explicit private right of action in the statutory scheme nor can one be implied from the statutory language and the legislative history." 2016 WL 3619331, at *1; *see also, e.g.*, *Flagstar Bank, FSB v. State*, 978 N.Y.S.2d 266, 273 (App. Div. 2013) (observing that "the Legislature clearly knew how to include a private right of action when it intended to do so, and the omission of any similar language in [the statutes in question] evinces a legislative intent not to provide for a private right of action"); *Davis v. State*, 937 N.Y.S.2d 521, 523 (App. Div. 2012) ("It is beyond cavil that the Legislature knew how to include a private right of action in the former statute if it intended to do so and, '[c]onsidering that the statute gives no hint of any private enforcement remedy for money damages,' we will not infer that the Legislature in fact intended to do so.'" (citing *Mark G. v. Sabol*, 717 N.E.2d 1067 (N.Y. 1999))). Therefore, because there is no private right of action under DASA, summary judgment is granted in defendants' favor on the DASA claim.

### 4. Negligent Infliction of Emotional Distress Claim

"A claim for negligent infliction of emotional distress cannot be asserted if it is 'essentially duplicative of tort or contract causes of action.'" *Virgil v. Darlak*, No. 10-CV-6479P, 2013 WL 4015368, at *10 (W.D.N.Y. Aug. 6, 2013) (quoting *Djangmah v. Falcione*, 2013 WL 208914, *9 (S.D.N.Y. Jan. 18, 2013)); *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) ("The New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available." (citing *Fischer v. Maloney*, 373 N.E.2d 1215 (N.Y. 1978))).

Plaintiffs contend that defendants "owed JT . . . a special duty of care to be free from physical harm or threats of physical harm while at school, and to be free from harassment by teachers and students," but breached this duty by permitting a continuous pattern of bullying and harassment, causing J.T. severe emotional distress. (*See* Pls.' Second Am. Compl. ¶¶ 71-72, ECF No. 20.) As evident from the discussion of the negligent supervision claim, this argument mirrors that claim, and therefore shall not be permitted to proceed separately.[14] *See, e.g.*,

---

[14] Defendants also argue that they cannot be liable for negligent infliction of emotional distress because their conduct did not "rise to the level of outrageous and extreme conduct that is utterly intolerable in a

*Caravalho v. City of New York*, No. 13CV4174PKCMHD, 2016 WL 1274575, at *23 (S.D.N.Y. Mar. 31, 2016) (dismissing as duplicative negligent infliction of emotional distress claim because "the conduct at issue—[the defendant's] allegedly unreasonable use of force—and any resulting emotional damage is entirely subsumed by [the plaintiff's] common law assault and battery claim and his federal excessive force claim"); *Virgil*, 2013 WL 4015368, at *10 (dismissing negligent infliction of emotional distress claim because the "conduct that provides the basis for [the plaintiff's] claim for negligent infliction of emotional distress is the same conduct underlying his claim for medical malpractice").

### 5. Intentional Infliction of Emotional Distress

Plaintiffs abandoned their intentional infliction of emotional distress claim in their opposition. (Opp'n at 21.) Therefore, summary judgment is granted on this claim as well.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to all claims, except plaintiffs' First Amendment retaliation and negligent supervision claims.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 16, 2016
       Central Islip, NY

\*\*\*

Plaintiffs were represented on the motion for summary judgment by Russell J. Platzek, Law Office of Steven A. Morelli, 1461 Franklin Avenue, Garden City, NY 11530. Plaintiffs are currently represented by Jonathan A. Tand, Tand & Associates, 990 Stewart Avenue, Suite 130, Garden City, NY 11530. Defendants are represented by Lewis R. Silverman, Silverman & Associates, 445 Hamilton Avenue, Suite 1102, White Plains, NY 10601.

---

civilized community." (Mot. at 36.) However, recent case law suggests that the conduct at issue need not be outrageous and extreme in order to make out a claim for negligent infliction of emotional distress. *See Ben v. United States*, No. 5:14-CV-0370 (CJS), 2016 WL 447713, at *16 (N.D.N.Y. Feb. 4, 2016) ("However, the New York State Supreme Court, Appellate Division, Second Department, recently purported to clarify that 'extreme and outrageous conduct' is not a required element of an NIED claim." (citing and following *Taggart v. Costabile*, 14 N.Y.S.3d 388, 398 (App. Div. 2015) ("[W]e now clarify that, notwithstanding case law to the contrary, extreme and outrageous conduct is not an essential element of a cause of action to recover damages for negligent infliction of emotional distress."))).